# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JOSEPH WOBIG and CARRIE WOBIG,

Plaintiffs,

v.

SAFECO INSURANCE COMPANY OF ILLINOIS,

Defendant.

Civil No. 20-431 (JRT/KMM)

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Robert A. Gust, **GUST LAW FIRM PLLC**, 3800 American Boulevard, Suite 1500, Minneapolis, MN 55431, for plaintiffs.

Daniel W. Berglund and Meghan M. Rodda, **GROTEFELD HOFFMANN LLP**, 150 South Fifth Street, Suite 3650, Minneapolis, MN 55402, for defendant.

Plaintiffs Joseph and Carrie Wobig filed an insurance claim for damage to a pole barn, used in part as a shop, on their residential property through their homeowners insurance policy with Defendant Safeco Insurance Company. Safeco denied the claim after an investigation, finding that the shop was used for the Wobigs' business, Wobig Construction, and therefore excluded from coverage under the Wobigs' policy. The Wobigs initiated this action, claiming that Safeco breached their contract and denied their insurance claim in bad faith. The parties have now filed motions for summary judgment. Because the business use exclusion in the Wobigs' homeowners insurance policy applies

broadly, and the record contains evidence such that no reasonable jury would conclude the shop was not used at least occasionally for business, the Court will deny the Wobigs' Motion, grant Safeco's Motion, and enter judgment in favor of Safeco.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

Plaintiffs Joseph and Carrie Wobig own residential property in Zumbrota, Minnesota, on which there are currently two structures: a pole barn and a main house. (*See* 1st Wobig Decl. ¶¶ 2–3, 5, Jan. 14, 2021, Docket No. 43.)  The pole barn comprises a shop area and cold storage/garage area (collectively, "the shop") and an apartment. (*Id.* ¶ 2.)  The shop features an entertainment area with bar, TVs, and pool and air hockey tables, as well as a vintage car collection, and equipment for working on cars and other vehicles. (*Id.* ¶ 3.)  Tools and equipment are kept in the cold storage/garage area. (*Id.* ¶ 4.)

On February 6, 2019, the Wobigs returned home from a snowmobiling vacation and discovered that heating coils in the floor of the shop froze and cracked during a severe cold snap.  (1st Wobig Decl. ¶ 9; *see also* 1st Decl. Daniel W. Berglund ("1st Berglund Decl.") ¶ 24, Ex. 23 at 2, Jan. 15, 2021, Docket No. 49-11.)  Mr. Wobig concluded that the entire floor would need to be replaced based on the damage.  (1st Wobig Decl. ¶ 9.)  The Wobigs promptly reported the loss to Defendant Safeco Insurance Company, (*id.* ¶ 10), which provided the Wobigs' homeowners insurance, (*see* 1st Berglund Decl. ¶ 13, Ex. 12 ("Safeco

Policy"), Jan. 15, 2021, Docket No. 49-6.) Safeco denied the claim on December 17, 2019 on the basis the Wobigs used the shop for their business, Wobig Construction, and the policy contains a business use exclusion for other structures on residential property. (1st Berglund Decl. ¶ 31, Ex. 30 ("Claim Denial") at 41–42, Jan. 15, 2021, Docket No. 49-12.)

### A. Wobig Construction

Joseph Wobig is sole owner of Wobig Construction. (1st Wobig Decl. ¶ 1.) After the shop was built, Wobig Construction changed its registered business address to the Wobigs' residential property and includes the residential address on the company website.[1] (1st Berglund Decl. ¶ 5, Ex. 4, Jan. 15, 2021, Docket No. 49-3; *id.* ¶ 6, Ex. 5, Jan. 15, 2021, Docket No. 49-4.) Mr. Wobig does not differentiate between personal and business property. (*See, e.g.*, 1st Berglund Decl. ¶ 14, Ex. 13 ("Wobig Dep.") at 47:20–48:10, Jan. 15, 2021, Docket No. 49-7.) Loan payments for the Wobigs' property are made through a Wobig Construction bank account, and Wobig Construction takes deductions for those payments. (1st Berglund Decl. ¶ 4, Ex. 3 ("Hemann Dep.") at 13:14–24, 27:15–19, 41:11–17, Jan. 15, 2021, Docket No. 49-3.)

In 2014, when the pole barn was built, Mr. Wobig told the Wobigs' accountant, Glen Hemann, that he might use the shop area for business purposes. (Hemann Dep. at 22:1–13.) Because the Wobigs did not have another shop, Hemann advised that they

---

[1] The main house and the shop have the same address. (1st Wobig Decl. ¶ 15.)

could take a business use depreciation and deduction on it.[2] (*Id.* at 22:7–17.) Hemann carried forward the depreciation and deduction into subsequent years, apparently without any further discussion about the nature of the use of the shop. (1st Decl. Robert Gust ("1st Gust Decl.") ¶ 2, Ex. 2 at 87:6–88:5, Jan. 14, 2021, Docket No. 45-2.) The Wobigs did not take depreciation in 2019, and Hemann wrote to Safeco's forensic accounts to inform them that the 2018 return would be amended to withdraw the depreciation because Hemann was mistaken about the use of the shop. (1st Gust Decl. ¶ 3, Ex. 3 at 1, Docket No. 45-3.) No tax depreciation or deductions were ever taken for the apartment portion of the pole barn.

B. **The Wobigs' Homeowners Insurance Policy from Safeco**

The Wobigs applied for homeowners insurance with Defendant Safeco Insurance Company in 2017. (1st Berglund Decl. ¶ 12, Ex. 11 at 3, Jan. 15, 2021, Docket No. 49-6.) To obtain insurance, the Wobigs worked with Freedom Insurance Agency, Inc., which represents numerous insurers. (*Id.*; 2nd Decl. Daniel W. Berglund ("2nd Berglund Decl.") ¶ 4, Ex. 41 at 2, Feb. 5, 2021, Docket No. 54-3.) In their electronic application— purportedly completed by Freedom Insurance agent Jacob Simmons, (1st Wobig Decl. ¶ 7)—the Wobigs answered "no" to the underwriting questionnaire prompt, "Is there a

---

[2] To claim a tax depreciation, property must be used for business. (1st Berglund Decl. ¶ 39, Ex. 38, Jan. 15, 2021, Docket No. 49-14.)

business on the premises?" (1ˢᵗ Berglund Decl. ¶ 12, Ex. 11 at 9–10.)  Accordingly, Safeco issued a homeowners policy without an endorsement for a home business.  (*See* Safeco Policy at 27.)  Several provisions of the Policy are relevant to the current Motions:

**COVERAGE B – OTHER STRUCTURES**

We cover:

1. Fences, driveways and walkways; and
2. Other structures on the *residence premises*, separated from the premises by clear space. . . .

**BUILDING PROPERTY WE DO NOT COVER**

. . .

2. Other structures:
   a. used in whole or in part for *business*; or
   b. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private residence or garage.

**COVERAGE C – PERSONAL PROPERTY**

. . .

3. SPECIAL LIMITS FOR PERSONAL PROPERTY
. . .
h. *Business* property, not excluded elsewhere, while located on the *residence premises*.  Up to $1,000 of the limit on your Policy Declarations may be used for *business* property, not excluded elsewhere, while located off the *residence premises*.

**PERSONAL PROPERTY WE DO NOT COVER**

. . .

10. *Business* property or merchandise:
    a. in storage;
    b. held as a sample; or
    c. held for sale or delivery after sale.

> **POLICY DEFINITIONS**
>
> . . .
>
> c. "*Business*" means a trade, profession or occupation engaged in on a full-time, part-time or occasional basis, or any other activity, including civic or public, engaged in for money or other compensation, except for the following:
>   (1) One or more activities, not described in (2) below, for which no *insured* receives more than $3,000 in total compensation for the 12 months before the beginning of the policy period; and
>   (2) *volunteer* activities for which no money or other compensation is received other than for expenses incurred to perform the activity.

(*See* Policy at 27–52.) Safeco applies no specific criteria to determine whether something is a "business use" within the meaning of the homeowner's policy, although there are guidelines for determining risk if a customer seeks a home-business policy, including the type of business conducted at the property; the number of employees at the property; number of customers visiting; whether the customer has a commercial policy; and whether there is any signage on the property advertising the business. (1st Gust Decl. ¶ 7, Ex. 7 at 2, Docket No. 45-7.)

The Wobigs carry additional insurance on vacation homes and vehicles. (1st Wobig Decl. ¶ 6.) Wobig Construction also has general liability insurance, insurance for its vehicles, workers' compensation insurance, and insurance on other property where the company stores equipment. (*Id*.) As of the date of the present Motions, Safeco continues to provide homeowner's coverage to the Wobigs under the same policy. (2nd Wobig Decl. ¶ 1, Ex. 1, Feb. 5, 2021, Docket No. 55-1.)

### C. Safeco's Investigation & Denial of the Wobigs' Claim

When the Wobigs submitted their claim for the shop floor heat coils freezing in February 2019 through their Safeco homeowners policy, Safeco initially assigned the claim to the Fast Path Unit because Safeco thought it was a small claim. (1st Berglund Decl. ¶ 24, Ex. 24 ("Mitchell Dep.") at 11:17–13:8, Jan. 15, 2021, Docket No. 49-12.) When Safeco determined that the claim may involve concrete removal, the claim was reassigned to an individual adjuster. (1st Berglund Decl. ¶ 26, Ex. 25 ("Safeco Claim Records") at 27, Jan. 15, 2021, Docket No. 49-12.) The adjuster did an initial inspection on February 13, 2019.[3] (*Id.*) The adjuster reported that the shop—an "other structure" under the Policy—was large and would be a substantial claim, (*id.* at 26–28), and that the Wobigs told him they have a construction company and build race cars in the structure,[4] which suggested the shop was used in whole or in part for business purposes, (1st Berglund Decl. ¶ 27, Ex. 26, Jan. 15, 2021, Docket No. 49-12.) Safeco issued a reservation of rights letter, informing the Wobigs that Safeco was investigating the claim. (1st Berglund Decl. ¶ 28, Ex. 27, Jan. 15, 2021, Docket No. 49-12.)

---

[3] Safeco states that the initial inspection occurred on February 15, 2019, but the claim records show that an inspection took place on February 13, 2019. (*See* Safeco Claim Records at 27.)

[4] Although not the main focus of the case, Safeco asserts that Joseph Wobig uses the shop for business insofar as he sells cars and vehicles built or refurbished in the shop for a profit. Evidence in the record shows Mr. Wobig posting cars for sale online, (2nd Berglund Decl. ¶¶ 12–14, Exs. 49–51, Feb. 5, 2021, Docket No. 54-6), as well as seeking a mechanic to help him with his cars and the construction fleet, (2nd Berglund Decl. ¶ 15, Ex. 52, Feb. 5, 2021, Docket No. 54-6.)

Safeco then transferred the claim to its Special Investigation Unit, but after additional meetings with Mr. Wobig, the Special Investigation Unit determined that there were no fraud concerns and referred the claim back to the adjustment team on May 1, 2019; the claim was then transferred to the Large Loss Unit and assigned to claims investigator Geoffrey Johnson. (Safeco Claim Records, at 13–14, 18–19.)

Johnson visited the Wobigs' property on July 9, 2019. (*Id.* at 13.) While onsite, Johnson observed a Wobig Construction employee enter the fourth garage stall, the cold storage area, and remove tools. Safeco had not previously inspected the cold storage area of the shop, so Johnson photographed its contents. (*Id.*; 1st Berglund Decl. ¶ 29, Ex. 28 at 21:9–23.) Photos show equipment such as shovels, ladders, nail guns, chain saws, bags of mortar, and Wobig Construction yard signs.[5] (*See generally* 1st Berglund Decl. ¶ 3, Ex. 2, Docket No. 49-2.) Mr. Wobig has testified that Wobig Construction was doing a landscaping project at the property, and that the worker entered the shop to get equipment for that project and that some of the equipment in the cold storage area was for that landscaping project. (1st Wobig Decl. ¶ 12.)

---

[5] Johnson took photos of the other three stalls of the shop as well, where Wobig Construction was storing furnishings from a home the company was renovating. (See 1st Berglund Decl. ¶ 3, Ex. 2.) Mr. Wobig has testified that the furniture was stored temporarily before being donated. (1st Wobig Decl. ¶ 13.)

The Wobigs dispute whether or to what extent the equipment in the cold storage area is construction equipment for Wobig Construction. It is undisputed, however, that Wobig Construction employees have access to the shop, including the cold storage area; that employees visit the property around once a week; and that Wobig Construction uses Mr. Wobig's tools—including those kept in the shop—if needed, rather than purchasing new tools or equipment for company projects. (*Id.* ¶¶ 3–4.)

Johnson's visit prompted Safeco to reopen its investigation. Forensic accountants examined the Wobigs' tax records and concluded that Wobig Construction's 2018 tax return included depreciation for the shop portion of the pole barn, but not the apartment. (1st Berglund Decl. ¶ 30, Ex. 29 at 38, Docket No. 49-12.) Safeco also conducted examinations under oath of the Wobigs, which revealed additional information about the Wobigs' use of their property and the shop, including that they maintain a home office and customers visit the Wobigs' house about six times per year, and employees visit the property once a week to exchange or delivery supplies, but the only Wobig Construction signage on the property is yard signs placed on customers' yards during a project. (*See* 2nd Berglund Decl. ¶ 9, Ex. 46 at 17, Feb. 5, 2021, Docket No. 54-5.) New vehicles or equipment may be on the property before they start being used, but a majority of Wobig Construction equipment is stored at other properties. (*Id.*)

Based on these findings, Safeco concluded that the Wobigs were using the shop for their business and denied the claim on December 17, 2019. (Claim Denial at 41–42.)

In the claim denial letter, Safeco informed the Wobigs that its investigation findings were "confirmed by [the Wobigs'] accountant who prepared the tax returns for [their] business, Wobig Construction, LLC, which [the Wobigs] supplied to [Safeco]." (*Id.* at 42.) The claim denial letter further stated that the Wobigs' homeowner's "policy does not cover other structures used in whole or in part for business." (*Id.*)

II. **PROCEDURAL BACKGROUND**

Before initiating a civil action, the Wobigs submitted a complaint to the Minnesota Department of Commerce.[6] (*See* 1st Berglund Decl. ¶ 32, Ex. 31 at 49, Jan. 15, 2021, Docket No. 49-12.) After obtaining responses from Safeco on November 18, 2019, (*see* 2nd Berglund Decl. ¶ 16, Ex. 53 at 2–3, Feb. 5, 2021, Docket No. 54-7), the Department issued a letter to the Wobigs on January 2, 2020, stating that based on the information presented, "it does not appear that the insurer has acted in violation of applicable statute or policy provisions in the administration of this matter and has a reasonable basis for the claim determination." (1st Berglund Decl. ¶ 32, Ex. 31.) The Department of Commerce cannot make factual findings. (*See id.*)

On January 14, 2020, the Wobigs filed a complaint in Minnesota state court alleging breach of contract, negligence, and breach of warranty of fitness for a particular

---

[6] The date the Wobigs submitted the complaint to the Department of Commerce is unclear, but in their operative Complaint, they assert that they did so while Safeco was still investigating the Claim. (Am. Compl. ¶ 20.)

purpose related to Safeco's insurance coverage of the Wobigs' property damage. (Compl. ¶¶ 28–49, Feb. 3, 2020, Docket No. 1-1.) Safeco removed the matter to federal court on February 3, 2020, asserting diversity jurisdiction. (Notice of Removal ¶¶ 8–14, Feb. 3, 2020, Docket No. 1.) On June 16, 2020, the Wobigs filed an Amended Complaint, in which they added a claim for bad faith claim denial pursuant to Minnesota Statute § 604.18. (Am. Compl. ¶¶ 50–60, June 16, 2020, Docket No. 16.) Safeco answered the operative Complaint on June 26, 2020. (Answer, June 26, 2020, Docket No. 17.)

Pursuant to the operative scheduling order, the parties filed Motions for Summary Judgment. (Pls.' Mot. Summ. J., Jan. 14, 2021, Docket No. 41; Def.'s Mot. Summ. J., Jan. 15, 2021, Docket No. 46.) These Motions are now before the Court. However, the parties have stipulated to expert discovery and certain fact discovery to continue past the deadline for dispositive motions. (*See* 2nd Am. Scheduling Order at 1–2, Nov. 30, 2020, Docket No. 23; 3rd Am. Scheduling Order, Dec. 14, 2020, Docket No. 40.)

**DISCUSSION**

**III. STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

IV.  **ANALYSIS**

  A.  **Count I: Breach of Contract**

Sitting in diversity, the Court applies Minnesota substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). To prevail on a breach of contract claim under Minnesota law, the plaintiff must prove "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (citation omitted). The Wobigs' breach of contract claim turns on whether the Wobigs' insurance claim from the February 6 loss is excluded by the terms of their policy with Safeco, specifically

whether the shop was excluded because it was used in whole or in part for business. If so, then Safeco did not breach the contract because it properly denied the Wobigs' claim.

### 1. "Business Use"

To determine whether the policy provides coverage, the Court must interpret its language. *Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 691 (Minn. 2018). When construing insurance contracts, the Court aims to "ascertain and give effect to" the parties' intent based on the terms of the contract. *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013) (citation omitted). If the language is clear and unambiguous, the contract is interpreted based on its ordinary meaning in the context of the entire contract; if the language is ambiguous the ambiguities are resolved against the insurer. *See id.* at 704–05. The Court should not, however, read an ambiguity into the terms of the contract to provide coverage. *Farkas v. Hartford Accident & Indem. Co.*, 173 N.W.2d 21, 24 (1969). "In an action to determine coverage under an insurance policy containing an exclusion clause, the insurer bears the burden of proving the exclusion bars coverage[,]" and then the burden shifts back to the insured to prove any exception to such exclusion. *Smith v. State Farm Fire & Cas. Co.*, 656 N.W.2d 432, 436 (Minn. Ct. App. 2003).

The Wobigs' Safeco policy excludes "other structures" that are "used in whole or in part for business[.]" (Safeco Policy at 27.) The Minnesota Supreme Court has defined "business purpose" language in insurance policies to encompass the "type of activity in

which persons regularly engage for the purpose of earning a livelihood or for gain such as a 'trade, profession or occupation.'" *Allied Mut. Cas. Co. v. Askerud*, 94 N.W.2d 534, 539–40 (Minn. 1959).[7] Here, however, the Wobigs' policy defines "business" as "a trade, profession or occupation engaged in on a full-time, part-time or occasional basis, or any other activity, including civic or public, engaged in for money or other compensation," (Safeco Policy at 50), and only excludes activities "for which no insured receives more than $3,000 in total compensation for the 12 months before the beginning of the policy period[.]" (*Id.*) Moreover, the policy provides that "other structures" are excluded even if they are used "in part" for business, illustrating that business need not be the sole or dominant use of the structure for the exclusion to apply. Put differently, a mixed-use "other structure" would still be excluded. As such, the plain language of the Safeco Policy evinces a much broader meaning for "business use" than the interpretation of "business purpose" in the caselaw.

The Wobigs contend that reading the Policy as excluding coverage for "other structures" with infrequent or minimal business activity would violate their reasonable consumer expectations, because they were asked whether there is a business on the

---

[7] The exclusion for "business pursuits" in the policy at issue in *Askerud* apparently did not include any further definition. The policy exclusion read: "This policy does not apply . . . to any business pursuits of an insured, other than activities therein which are ordinarily incidental to nonbusiness pursuits[.]" 94 N.W.2d at 539. Thus, the plain language of the exclusion in that case, in contrast to the Safeco Policy, applies coverage to a residence that is ordinarily used for nonbusiness purposes, even if there are incidental business uses as well.

-14-

premises in the insurance application and, they contend, there is no business on their residential premises; Wobig Construction does its work on construction sites, not on the Wobigs' property. Indeed, under Minnesota law, "[p]olicy provisions must be interpreted according to what the insured would have reasonably understood them to mean." *Smith*, 656 N.W.2d at 435. Yet this "reasonable expectations doctrine" applies only in narrow circumstances, "where a party's coverage is significantly different from what the party reasonably believes it has paid for and where the only notice the party has of that difference is in an obscure and unexpected provision." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 49 (Minn. 2008) (discussing *Atwater Creamery Co. v. Western Nat. Mut. Ins. Co.*, 366 N.W.2d 271 (Minn. 1985)). These narrow circumstances do not exist here; the policy is unambiguous, and the business use exclusion is neither obscured nor unexpected, given that the policy is for homeowners insurance. As such, the Court will not apply the reasonable expectations doctrine.

In sum, the meaning of "used in whole or in part for business" within the policy is broad, and the business use exclusion precludes coverage if a structure is used in any manner for any endeavor done for money, if total compensation from the endeavor was more than $3,000 in the prior year.

### 2. Application of "Business Use" Exclusion to the Wobigs' Claim

Having determined that the business use exclusion casts a broad net based on the policy's plain language, the next question is whether the Wobigs' shop falls within the

exclusion. As an initial matter, Wobig Construction generates revenues of around $5 million annually, and therefore the exception for activities generating less than $3,000 is inapplicable. The record includes a number of undisputed facts about the Wobigs' use of the shop and their business. The Wobigs use their residential address, which encompasses both the main house and the shop, as their registered business address. Wobig Construction's taxes show deductions for loan payments and depreciation for the shop, although the depreciation was eliminated through amendment for 2018 and not taken in 2019. More pointedly, Mr. Wobig himself acknowledges that he instructs Wobig Construction employees to use his personal tools—which are kept in the shop—instead of purchasing new tools when needed and that Wobig Construction yard signs have been stored in the shop.

Because the definition of "business use" in the policy is broad and does not require any minimum level of business use to be triggered, so long as the enterprise generates $3,000 or more per year, based on these undisputed facts any reasonable jury would find that the shop is used at least in part for business. Thus, Safeco properly denied coverage under the Policy, did not breach the contract, and its Motion for Summary Judgment as to Count I will be granted.

### 3. Count IV: Bad Faith Denial

In addition to asserting that Safeco breached their contract by denying their claim for the shop, the Wobigs contend that Safeco did so in bad faith. Pursuant to Minnesota

Statutes § 604.18 subdivision 2(a), an insurer is liable if there was an "absence of a reasonable basis for denying the benefits of the insurance policy" and the insurer either "knew of the lack of a reasonable basis" or "acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the insurance policy." However, "an insurer does not violate [§ 604.18, subd. 2] by conducting or cooperating with a timely investigation into arson or fraud." Minn. Stat. § 604.18, subd. 2(c). Since the Court finds that, as a matter of law, Safeco did not breach the insurance contract because any reasonable jury would conclude that the Wobigs' shop was used at least in part for business, Safeco cannot have denied the claim in bad faith. As such, the Court will grant Safeco's Motion as to Count IV.

### B. Count II: Negligence

Because the Court finds that Safeco did not breach the Wobigs' insurance policy, the Court must determine whether Safeco is nonetheless liable for negligence because the Wobigs' insurance salesperson, Jacob Simmons, failed to inform them that coverage would be denied for the shop under the Safeco homeowners policy. The Wobigs assert that Simmons was Safeco's agent and therefore Safeco is liable for his actions, whereas Safeco argues that Simmons was an insurance broker.

Generally, an insurance agent works on behalf of the insurer, whereas an insurance broker works for the insured. *Eddy v. Republic Nat. Life Ins. Co.*, 290 N.W.2d 174, 176 (Minn. 1980). An insurer may be liable for the torts of its agents within the scope of their

employment. *Id.* Whether an agency relationship exists between an insurer and insurance salesperson has traditionally been a fact-intensive inquiry under Minnesota law, *see id.* at 177, depending on, for example, (1) whether they are employed by or acting independently of the insurer; (2) the source of their express or implied authority to act; and (3) whether they are expressly authorized to accept an application for insurance on behalf of the insurer, *see Morrison v. Swenson*, 142 N.W.2d 640, 646 (Minn. 1966) (listing non-exclusive factors).

However, Minnesota statutes also provide that "a person performing acts requiring a producer license . . . is at all times the agent of the insurer and not the insured." Minn. Stat. § 60K.49 subd. 1. The Wobigs argue that this statute superseded the traditional factual analysis, and therefore, under § 60K.49, Simmons must have been Safeco's agent. The Minnesota Supreme Court has referenced the statute in dicta after reciting the traditional fact-based standard for distinguishing between an agent and broker, saying that the "distinction, however, appears to have been superseded by statute." *Graff v. Robert M. Swendra Agency, Inc.*, 800 N.W.2d 112, 118 n.5 (Minn. 2011). But after citing the statutory language, the court said that it would "assume for purposes of this decision that Robert Swendra was an agent for American Family without applying or disregarding *Eddy*." *Id.* As such, Minnesota courts have not definitively determined whether the fact-based analysis of an agency relationship has been superseded by statute.

Yet, irrespective of whether Simmons was acting as Safeco's agent, the Wobigs cannot establish, as a matter of law, that Simmons was negligent. A claim for negligent procurement of insurance coverage requires a showing that the agent owed a duty of reasonable care in procuring insurance, the duty was breached, and the insured sustained a loss. *Id.* at 116. Insurance agents have a duty "to exercise the standard of skill and care that a reasonably prudent person engaged in the insurance business will use in similar circumstances," *id.* (quoting *Johnson v. Farmers & Merchs. State Bank of Balaton*, 320 N.W.2d 892, 898 (Minn. 1982)), to act in good faith and follow instructions, *Ma Amba Minn., Inc. v. Cafourek & Assocs., Inc.*, 387 F. Supp. 3d 947, 953 (D. Minn. 2019), and an affirmative duty to perform actions specifically undertaken for the client, *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543 (Minn. 1989). The record includes no evidence that would permit a reasonable juror to conclude that Simmons had an affirmative duty to advise the Wobigs that their use of the shop would not be covered by the Safeco homeowner's policy or, even if such a duty did exist, how Simmons breached it. The Court will therefore grant Safeco's Motion with respect to Count II.

### C. Count III: Breach of Implied Warranty of Fitness for a Particular Purpose

The Wobigs further claim that Safeco breached the implied warranty of fitness for a particular purpose because the homeowners policy did not fulfill their insurance needs despite the Wobigs communicating their needs to Simmons before selecting the policy. An implied warranty of fitness for a particular purpose exists if the seller, "at the time of

a contract, has reason to know that the buyer has a particular purpose for goods purchased, and the buyer relies on the seller's judgment or skill to select those goods." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 817 (Minn. Ct. App. 2010). Because implied warranty claims apply to the purchase of consumer goods and the Wobigs offer no support for why the Court should extend the doctrine to insurance policies, the Court finds that the Wobigs cannot prove their claim as a matter of law. The Court will grant Safeco's Motion as to Count III.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 46] is **GRANTED**;

2. Plaintiffs' Motion for Summary Judgment [Docket No. 41] is **DENIED**; and

3. The action is dismissed.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 7, 2021  
at Minneapolis, Minnesota.

_____  
JOHN R. TUNHEIM  
Chief Judge  
United States District Court